A. KRISTINA LITTMAN (NJ Bar No. 04350-2005)
STEVEN D. BUCHHOLZ (Cal. Bar No. 202638)
 buchholzs@sec.gov
MARC D. KATZ (Cal. Bar No. 189534)
 katzma@sec.gov
ALICE L. JENSEN (Cal. Bar No. 203327)
 jensena@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 3:20-cv-04190 |
| Plaintiff, | |
| v. | |
| JACK ALAN ABRAMOFF, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1. This case involves the fraudulent and unregistered offer and sale of digital asset securities by NAC Foundation, LLC ("NAC"), a company that was in early-stage development of a blockchain-based digital token called AML BitCoin, which NAC claimed was superior to the original bitcoin because it had anti-money laundering, know-your-customer, and other security features encoded in the smart contracts for the token and was compliant with regulatory requirements relating to cryptocurrencies, including in the United States. NAC's founder and Chief Executive Officer, Rowland Marcus Andrade, was the primary architect and beneficiary of the fraudulent offering. With lobbyist and consultant Jack Alan Abramoff, NAC and Andrade promoted the offering. The offering raised at least $5.6 million from approximately 2,400 retail

investors, primarily in the United States, from at least August 2017 through December 2018. The Commission has filed a separate action against NAC and Andrade.

2. The tokens NAC offered and sold during the offering, including through an initial coin offering ("ICO") phase to the general public between October 2017 and February 2018, constituted a "security" under the federal securities laws. The definition of "security" includes a range of investment vehicles, including "investment contracts." Investment contracts are transactions involving the investment of money in a common enterprise with the reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. Investors in NAC's offering reasonably viewed the offering as an opportunity to profit based on the purported innovative technology breakthroughs and prospective development of the advertised features of the token and blockchain.

3. NAC's offering materials stated that while the proprietary anti-money laundering, know-your-customer, and other security features of AML BitCoin had already been developed, certain additional features of the token and NAC's "privately regulated public blockchain" were still being completed, and as a result, NAC would initially issue tokens with symbol "ABTC" that could eventually be exchanged one-for-one for functional AML BitCoin tokens (the "Token"). NAC issued the Tokens in May 2018, and NAC took steps to make the Tokens available for trading on third-party platforms or exchanges. The Tokens became available for trading on at least one such platform beginning in May 2018.

4. During the offering, the Tokens had no practical use. NAC did not have a platform where the Tokens could be used to purchase goods or services or transact any business, they could only be exchanged for other digital assets or fiat currencies on third-party platforms. NAC marketed the Tokens to investors who reasonably viewed the Tokens as a tradeable investment vehicle that might appreciate in value based on NAC's and Andrade's managerial and entrepreneurial efforts.

5. NAC and Andrade deceived investors in the offering by making it appear as if NAC had successfully developed the anti-money laundering, know-your-customer, and other

security features of AML BitCoin, when in reality the development efforts were in the early stages and the company needed to raise significant funds to conduct further development. They deceived investors by, among other things, making false and misleading statements in press releases, social media outlets, and other promotional materials regarding the status of the technology and governmental agencies' interest in using AML BitCoin in their payment systems. During the ICO, Abramoff became aware that some of the NAC offering and marketing materials contained false or misleading statements about the technology, and he continued to solicit investors and conduct promotional activities for the offering after that time. Abramoff arranged and helped write articles, which were purported to be written by independent authors rather than disclosing that they were paid promotions of NAC. Some of these articles included false and misleading statements about NAC's business.

6. NAC, Andrade, and Abramoff also deceived investors by making false and misleading statements in press releases and other promotional materials suggesting they were on the verge of airing a Super Bowl commercial for AML BitCoin that they falsely claimed was rejected by the National Football League and NBC because of its political content. Abramoff and Andrade also discussed a strategy to artificially increase the trading volume and value of the Token on digital asset trading platforms.

7. NAC and Andrade also made false and misleading statements to investors and potential investors about many aspects of NAC's business, including the development status of the AML BitCoin token, NAC's financial condition, and purported interest by and negotiations with governmental agencies for use of AML BitCoin in their payment systems. After Abramoff learned the status of the technology and NAC's financial condition, he continued to solicit investors and promote of the offering through the use of misstatements. These statements were made with the intent to deceive or with reckless disregard for the truth.

8. Based on these representations, investors would have reasonably believed that NAC had successfully developed the proprietary anti-money laundering, know-your-customer, and other security features of the AML BitCoin token, and that NAC was in advanced

negotiations with governmental agencies for use of the token in their payment systems. According to NAC and Andrade, NAC's technology was superior to the original bitcoin, compliant with regulatory requirements, and nearly ready for use in payment systems.

9. During the ICO, Abramoff became aware that the technology was in the early stages of development and that NAC only had introductory meetings with governmental agencies, none of which had led to follow-up meetings or negotiations about potential use of the AML BitCoin tokens in the agencies' systems. Abramoff also was aware at least by January 2018 that NAC could not pay for a Super Bowl advertisement, and that the commercial they produced for AML BitCoin had not been rejected by the National Football League or NBC.

10. In this action, the Commission seeks injunctions; disgorgement of ill-gotten gains, with prejudgment interest; civil monetary penalties; and other appropriate relief.

**JURISDICTION AND VENUE**

11. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

13. Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

14. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Defendant met with and solicited prospective investors in this District, and offers and sales of securities took place in this District.

15. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in San Francisco County.

**DEFENDANT**

16. **Jack Alan Abramoff**, age 61, of Silver Spring, Maryland, is a lobbyist and consultant who provided services to NAC during the offering.

**OTHER RELEVANT ENTITY AND INDIVIDUAL**

17. **NAC Foundation, LLC** is a Nevada limited liability company formed in 2014 with its principal place of business in Las Vegas, Nevada. NAC is wholly owned and controlled by Andrade.

18. **Rowland Marcus Andrade**, age 42, of Missouri City, Texas, is the Chief Executive Officer ("CEO"), President, founder, and sole owner of NAC

**FACTUAL ALLEGATIONS**

**A.    The Securities Registration Requirements and NAC's Offering**

19. Congress enacted the Securities Act of 1933 to regulate the offer and sale of securities. In contrast to ordinary commerce, which often operates under the principle of caveat emptor, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest. Such disclosure is ordinarily provided in a "registration statement," which provides public investors with financial and managerial information about the issuer of the securities, details about the terms of the securities offering, the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.

20. Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce. Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell

or offers to buy, unless a registration statement has been filed or an exemption from registration applies. Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce absent an exemption.

21. In a variety of circumstances, courts have found that investment vehicles other than traditional stocks and bonds constitute investment contracts. As the Supreme Court of the United States has noted, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

22. Beginning in at least August 2017 and continuing through September 2018, Abramoff participated in the offer and sale of NAC's digital asset securities. NAC's offering materials touted the prospect that its efforts to further develop the Token and blockchain, and to establish relationships with third parties for use of the Token in their payment systems, would increase demand for the Token. They also emphasized that only a finite number of Tokens would be created, such that rising demand for the Tokens would cause their value to appreciate.

23. Abramoff and NAC assured prospective buyers that, following distribution of the initial Tokens, buyers would be able to trade the Tokens on secondary trading platforms, enabling conversion of the Tokens to other digital assets, such as bitcoin or ether, or to fiat currency, such as U.S. dollars.

24. NAC raised at least $5.6 million during the offering from approximately 2,400 retail investors, primarily in the United States. Investors' funds were pooled in NAC's accounts and digital asset wallets and used to fund NAC's business, including for the further development of AML BitCoin and NAC's own blockchain.

25. Under the federal securities laws, Abramoff offered and sold securities from at least August 2017 through September 2018. But NAC has never filed with the SEC a registration statement for its offer and sale of securities, and no exemptions from registration were available. By failing to prepare and file a registration statement, NAC did not provide important information to investors regarding the investment opportunity promoted by NAC, such

as information about NAC's poor financial condition, future plans of operation and budget, the proposed use of investor proceeds, and detailed disclosure of material trends and the most significant factors that made the offering speculative and risky.  NAC thus failed to disclose information relevant for investors to evaluate NAC's promises about the investment potential of the Tokens and the AML BitCoin project.

### B. Background of NAC and Its Development of AML BitCoin

26. NAC began posting materials promoting AML BitCoin and the upcoming ICO on its website, through social media outlets, and by paying authors to write positive articles about AML BitCoin in or about August 2017.  Andrade wrote the White Paper describing the offering and the development of AML BitCoin and posted it on NAC's website, which was accessible to the investing public worldwide, on October 4, 2017.  The White Paper and NAC's website represented that NAC had developed and launched a predecessor to AML BitCoin, called Aten Coin, in September 2015, which NAC claimed was the first "cryptocurrency" designed to be anti-money laundering and anti-terrorist compliant and theft-resistant.  NAC claimed that this functionality was encoded in the Token and built based on patent-pending technology that Andrade licensed to NAC.

27. The White Paper represented that "AML BitCoin was created with anti-money laundering, anti-terrorism and theft-resistant properties built into the code of the coin, and as a result, it is compliant with a host of laws, including but not limited to: Anti-Money Laundering (AML), Counter Financing of Terrorism (CFT), Anti-Fraud and Financial Crimes (AFF), Office of Foreign Assets Control (OFAC), Bank Secrecy Act (BSA), USA PATRIOT Act and the FACT Act."

28. The White Paper further stated that "[u]sing proprietary technology, this identity-based digital currency is compliant with laws, statutes, rules, and regulations that govern, regulate, and relate to preventing money-laundering, terrorism, identity theft, financial crimes, and know-your-customer laws."

29. NAC also claimed that it was developing its own blockchain that would include additional features, such as certified digital identity verification, through a "white label AML/KYC Platform." NAC referred to this blockchain as a "privately regulated public blockchain," which it claimed would be faster and more efficient than the original bitcoin blockchain.

30. The White Paper stated that the process of integrating the AML BitCoin token features into the new blockchain was ongoing, and that purchasers in the offering would first receive a token (symbol ABTC) that could be traded on secondary platforms but would not have any of the features of AML BitCoin. NAC represented to purchasers that they could exchange the Tokens for functional AML BitCoin tokens on a one-for-one basis as soon as the new blockchain and tokens were ready.

31. A November 22, 2017 press release stated "NAC Foundation's just launched a dynamic digital currency, the AML BitCoin, which is the only cryptocurrency running on a privately regulated blockchain and using biometric identification protocols, including voice recognition, to verify the owners of AML BitCoin cryptowallets."

C. **NAC Offered and Sold Digital Asset Securities in an Unregistered Offering**

32. Between at least August 2017 and December 2018, including during the ICO phase from October 2017 through February 2018, NAC sold the Tokens to raise capital for the enterprise. Tokens could be purchased with fiat currency, bitcoin, ether, litecoin, and other digital assets at prices ranging from $0.35 to $0.45 per Token in the pre-sale prior to the ICO, then at prices ranging from $1.00 to $1.50 per Token in the ICO and after.

33. NAC advertised the Tokens as being available for purchase by individuals in the United States and worldwide through the AML BitCoin website, Facebook, Telegram, and other internet forums and social media pages.

34. According to the White Paper, NAC generated a total of 200 million Tokens, of which 76 million were available for purchase in the offering, which aimed to raise $100 million.

1  The remainder of the Tokens were retained by NAC and its administration team, including Andrade.

35. After the ICO, NAC applied to make the Tokens available for trading on secondary platforms. ABTC began trading on one such platform in May 2018 and later became traded on at least two additional platforms.

### D. NAC Marketed the Tokens as an Investment

36. NAC marketed the Tokens and the offering in a manner consistent with an investment. Purchasers would have reasonably viewed the offering as an opportunity to profit if Andrade and NAC were successful in their entrepreneurial and managerial efforts to further develop the advertised features of the Token and blockchain. Based on NAC's statements in the White Paper and on its website and in other online forums, purchasers would have reasonably believed they could pursue such profits by holding or trading the Tokens they received in the offering.

37. The Tokens had no use. NAC did not have a platform where the Tokens could be used to purchase goods or services or transact any business. Instead, their value derived entirely from trading on secondary digital asset trading platforms. NAC marketed the offering to investors who would have reasonably viewed the Tokens as a tradeable investment vehicle that might appreciate based on NAC's and Andrade's managerial and entrepreneurial efforts.

38. In one of NAC's social media channels, company representatives highlighted the availability of secondary market trading to attract investors. The White Paper also stated that "users may trade, sell and purchase [tokens] as they desire, including on participating exchanges and trading websites," and "to speculate."

39. Abramoff assisted Andrade with designing the NAC marketing plan, which was intended to create demand and market appreciation for the Tokens independent of any utility for the Tokens. Abramoff promoted the value of the Tokens to investors based on the eventual demand for Tokens if NAC and Andrade were successful in launching the blockchain and AML BitCoin, not on any utility of the Tokens issued in the offering.

40. NAC tied the value of the Token to purchasers' ability to quickly resell it to other investors, not to any immediate utility. The White Paper explicitly stated that the Tokens could "appreciate in value through speculative trading … ."

### E. NAC, Andrade, and Abramoff Made Materially False and Misleading Statements During the Offering

41. NAC's offering materials, press releases, social media posts, and marketing efforts contained materially false and misleading statements about the status of the technology and the status of purported negotiations with governmental agencies for use of AML BitCoin in their payment systems. This included a deceptive marketing scheme in which Andrade and Abramoff filmed an advertisement for AML BitCoin and claimed to have been on the verge of purchasing an expensive spot to air the ad during the Super Bowl, but that it was rejected by the NFL and NBC because of its political content.

#### 1. False or Misleading Statements About the Technology Development

42. NAC's marketing strategy for AML BitCoin, as reflected in its name, was to take advantage of the rising price of bitcoin in 2017 and tout the anti-money laundering, know-your-customer, anti-terrorism, and other security features that NAC claimed had already been built into the code of the Token. According to the White Paper authored by Andrade, "using proprietary technology, this identity-based digital currency is compliant with laws, statutes, rules, and regulations that govern, regulate, and relate to preventing money-laundering, terrorism, identity theft, financial crimes, and know-your-customer laws."

43. The White Paper also claimed that NAC's technology included a "personal legal identity-linked credential authentication protocol" that was built into the source code for the Token. This protocol purportedly included "an integration of three major processes, including (i) personal identity verification, (ii) credential authentication, and (iii) a two-party signature scheme."

44. In reality, NAC's technology for the Token did not have the anti-money laundering, know-your-customer, and other capabilities as claimed during the offering. Andrade

SEC v. ABRAMOFF                                    -10-                           SECURITIES AND EXCHANGE COMMISSION
                                                                                   44 MONTGOMERY STREET, SUITE 2800
                                                                                   SAN FRANCISCO, CA 94104 ‖ (415) 705-2500

retained a project manager and a series of software and blockchain developers during and after the offering to design a development plan and start developing the features that the offering materials claimed NAC's technology already contained, but Andrade quickly stopped paying each of these individuals and they made no progress in developing the features.

45. The Tokens never integrated biometric or other capabilities associated with personal identity verification or a multi-party signature protocol.

46. Abramoff became aware during the ICO that some of the offering and marketing materials contained false or misleading statements about the technology for the Tokens and the status of the development.

47. Communications between Andrade and Abramoff during the ICO acknowledged that "our whole system is non-existent so far" and that "our product has to be started from scratch." They also acknowledged that AML BitCoin's predecessor Aten Coin was a failure and that they had been unable to develop the identity verification features as of that time.

48. Statements about the capabilities of the Token technology and the status of development of the project were important to many potential investors because the technology was a basis of their investments.

### 2. False or Misleading Statements About Negotiations with the Panama Canal Authority

49. As part of NAC's fraudulent scheme, Andrade and Abramoff designed a strategy to obtain meetings with prospective governmental customers, and then Andrade later misrepresented the nature of the meetings as negotiations in press releases to generate interest in the offering. Some of these misrepresentations were repeated in an article that Abramoff arranged for an author to publish for compensation paid by NAC.

50. In a September 13, 2017 press release, NAC claimed that its Vice President of Latin America Affairs "has already commenced negotiations with a number of Latin American Governments, including Panama, to incorporate AML BitCoin in their payment and finance structures." Andrade told Abramoff that negotiations with the Panama Canal Authority were

1  underway, and Abramoff arranged for NAC to compensate an author, who did not disclose that
2  he was being paid by NAC, to publish an article on September 20, 2017 stating that NAC had
3  "commenced groundbreaking discussions with the Panama Maritime Authority to use AML
4  BitCoin in their payment structures … ."

5        51.    Abramoff drafted a November 8, 2017 press release based on information
6  provided to him by Andrade and others, and published by Andrade, in which NAC stated that it
7  "has been engaged in talks with Panamanian government and private sector representatives to
8  introduce AML BitCoin into the national financial and payment infrastructures," that NAC "has
9  been working with … the President of the Board of Directors and Minister of the Panama Canal,
10  to introduce the new currency as one of the Canal transit fee e-payment options," and that "NAC
11  Foundation executives have been talking with key Panama Canal officials about the possibility
12  of integrating the digital identity verification solutions built into AML BitCoin into the payment
13  systems which will be used by thousands of crews working on ships sailing under Panama's
14  flag."

15        52.    On November 9, 2017, the day after NAC's press release, a representative of the
16  Panama Canal Authority wrote to NAC stating that they had seen NAC's press release,
17  reminding NAC that "the meeting mentioned in the release still has not yet taken place," and
18  concluding that "this press release is misleading as no talks have taken place with Canal
19  executives."

20        53.    Abramoff also stated later in 2018 to at least one prospective investor that NAC
21  had deals "in place" or "locked up" with the Panama Canal Authority whereby AML BitCoin
22  would be the only digital asset accepted for passage fees through the Canal.

### 3. False or Misleading Statements About a Purported Super Bowl Commercial for AML BitCoin

25        54.    In January 2018, as part of NAC's deceptive marketing strategy to promote
26  interest in the offering, Abramoff and Andrade produced an advertisement featuring the
27  character of North Korean dictator Kim Jong-Un and paid for press to falsely claim that the ad

was rejected by the National Football League and NBC for airing during the Super Bowl because it was "too political."

55. Although NAC could not afford to pay the required $5 million to run a 30-second advertisement during the Super Bowl, Abramoff and Andrade hired a production company, filmed an advertisement, issued false press releases, and arranged and paid to have authors report that the advertisement was rejected by the NFL and NBC.

56. On February 2, 2018, NAC issued a press release titled "NFL Rejects Humorous AML BitCoin Super Bowl Ad Attacking North Korea" which stated that "The National Football League and NBC, the network broadcasting this Sunday's NFL Super Bowl game, have not accepted the controversial television ad from AML BitCoin, the world's only patent-pending digital currency with security features blocking criminals and terrorists."

57. On the same day, the same author who was paid to write misleading articles about the Panama Canal Authority and the Port of San Francisco published an article stating that the NFL "has refused to allow an ad by a new Bitcoin organization that wants to stop North Korea from abusing Bitcoin to evade sanctions and to keep that country's nuclear program from threatening the U.S. homeland." The same day, another author paid by NAC published an article titled "NFL Rejects Super Bowl Ad Because It Mocks Kim Jong-Un" which stated that "the league and NBC, the network broadcasting the game Sunday, have rejected a TV ad from AML BitCoin for being 'too political' according to the company." Neither of the authors disclosed that they had been paid through Abramoff to tout AML Bitcoin.

58. In fact, NAC never intended, and had nowhere near enough capital, to run an advertisement during the Super Bowl. Communications between Andrade and Abramoff confirm that they knew it was false to claim the Super Bowl advertisement had been rejected, and that they intended to create press attention around a fake rejection and conspired to conceal this plan from others.

### F. Andrade and Abramoff Developed a Plan to Artificially Support the Price and Trading Volume of the Token

59. Andrade and Abramoff also discussed a strategy to increase the trading volume and value of the Token on digital asset trading platforms through pre-arranged trading. Andrade arranged for NAC employees and third parties to buy Tokens on digital asset trading platforms to support the price, make it appear there was more trading volume than there really was, and avoid the Token being removed from the platforms due to low trading volumes.

60. In May 2018, Abramoff and Andrade also discussed a plan for NAC to retain a third-party "market maker" to artificially support the price of the Tokens through active trading, flooding internet chat rooms, and a call center operated by a team of ten people, which would cost NAC $2,500 plus $500 per person per month and 100,000 Tokens per month for six months. Andrade sent Tokens to the firm shortly thereafter.

### FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

61. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 60.

62. By engaging in the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

(a) Employed devices, schemes, or artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

63. By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

*Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

64. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 60.

65. By engaging in the conduct described above, Defendant, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

    (1)    with scienter, employed devices, schemes, or artifices to defraud;

    (2)    obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (3)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

66. By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

*Violations of Sections 5(a) and (5)(c) of the Securities Act*

67. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 60.

68. By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendant, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of

transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

69. By reason of the foregoing, Defendant directly or indirectly violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

**I.**

Permanently enjoin Defendant from directly or indirectly violating Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**II.**

Permanently enjoin Defendant from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

**III.**

Issue an order requiring Defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this complaint, together with prejudgment interest thereon.

**IV.**

Issue an order requiring Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Prohibit Defendant from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C.

§ 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: June 25, 2020        Respectfully submitted,


　　　　　　　　　　　　　　　/s/ Alice L. Jensen
　　　　　　　　　　　　　　ALICE L. JENSEN
　　　　　　　　　　　　　　Attorney for Plaintiff
　　　　　　　　　　　　　　SECURITIES AND EXCHANGE COMMISSION